1

2

3

4

5

6

7

8                                    UNITED STATES DISTRICT COURT

9                           FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   QUANTUM CAPITAL FUNDING                    No. 2:18-cv-03279-WBS-KJN
     CORP.,
12
                          Plaintiff,            FINDINGS AND RECOMMENDATIONS
13
            v.                                  (ECF No. 49)
14
     PDI GROUP, INC.; RG GROUP, LLC;
15   JOHN F. GEHM, JR.; JOHN F.
     GEHM, III; and DOES 1 through 25,
16   inclusive,

17                        Defendants.

18

19          Presently pending before the court is plaintiff Quantum Capital Funding Corporation's

20   motion for default judgment against defendants PDI Group, Inc.; RG Group, LLC; John Gehm

21   Jr.; and John Gehm III.[1]  (ECF No. 49.)  The court took the motion under submission without oral

22   argument.  For the reasons discussed below, the court recommends that plaintiff's motion be

23   GRANTED IN PART and DENIED IN PART with respect to liability and DENIED without

24   prejudice with respect to damages.

25   ///

26   _____
     [1]      This case was referred to the undersigned for all pretrial proceedings, pursuant to Local
27   Rule 302(c)(21), after defendants failed to retain new counsel.  (ECF No. 37.)  The present
     motion is also before the undersigned pursuant to Local Rule 302(c)(19).  See 28 U.S.C.
28   § 636(b)(1)(B).

                                               1

1    **I.**     **BACKGROUND**[2]

2         **A. Factual Background**

3         On December 28, 2018, plaintiff Quantum brought what is chiefly a breach of contract

4    action[3] against all defendants.  (ECF No. 1.)  Quantum is a Sacramento-based corporation "that

5    purchases outstanding receivables, purchase orders, and contracts at a discounted price from

6    businesses needing working capital assistance."  (ECF No. 1 ¶¶ 1, 10.)  At the time of the filing of

7    the complaint, defendants PDI Group, Inc. ("PDI") and RG Group, LLC ("RG Group") were

8    companies that provided plumbing contracting services, each with their principal place of

9    business and place of incorporation in the State of Missouri.  (Id. ¶¶ 2-3, 11.)  According to the

10   complaint, John Gehm Jr. and John Gehm III—father and son, respectively—together owned PDI

11   and were citizens of the State of Missouri at the time of the complaint's filing.  (Id. ¶¶ 4-5.)

12        On July 14, 2016, Quantum and PDI entered into an agreement—signed by Gehm III

13   only—contemplating Quantum's anticipated future purchase of a series of accounts receivable,

14   whereby PDI agreed to a governing set of "Terms and Conditions for Purchasing Accounts

15   Receivable."  (Id. at 16-23.)  Contemporaneously, Gehm III also signed two guarantees—one on

16   his own behalf and one on behalf of RG Group.  In the "Personal Guaranty and Subordination,"

17   Gehm III gave "assurance that Seller [PDI] will fully and promptly perform all of the Terms and

18   Conditions and will pay us [Quantum] when due any money Seller now or hereafter owes us,"

19   and he agreed that if PDI failed to do so, "it [would] be [his] obligation, in Seller's place, to

20   perform the obligations or pay [Quantum] in full without delay."  (Id. at 25 (Sec. II.A).)   Around

21   the time of signing, Gehm III "represented to Plaintiff, both verbally and via the various [signed]

22   warranties . . . that he was the sole owner, officer and director of PDI," with the power to enter

23   PDI into contractual agreements.  (Id. ¶ 55.)

24   _____

25   [2]      All facts derive from the complaint unless otherwise noted.  (See ECF No. 1.)

26   [3]      Quantum alleges a series of state-law causes of action all stemming from the primary
     breach of contract (claim 1) and failure to remit payments on several purchased accounts
27   receivable along with associated "factoring fees," including: money had and received (claim 2),
     open book account (claim 3), account stated (claim 4), intentional misrepresentation (claim 5),
28   negligent misrepresentation (claim 6), and conversion (claim 7).

The "Corporate Guaranty and Subordination" that Gehm III signed on behalf of RG Group contains language identical to the Personal Guaranty, obligating RG Group to perform or pay in the event of PDI's breach.[4]  (Id. at 28 (Sec. II.A); id. ¶ 14.)  Although Quantum alleges that Gehm III executed the Corporate Guaranty "on behalf of" RG Group (id. ¶ 14), the complaint does not otherwise indicated Gehm III's relationship to RG Group—for instance, whether he was a member of the LLC.

Over a period from October 27, 2016, to February 15, 2017, Quantum agreed to purchase from PDI and RG Group numerous accounts receivable, under a series of eight individual Offers to Sell/Agreements ("the Purchase Agreements"):  four with PDI and four with RG Group.[5] (ECF No. 1 ¶ 17; id. at 32-35 (PDI agreements) 31, 36-38 (RG Group agreements).)

Each individual Purchase Agreement expressly incorporated by reference the previously agreed upon Terms and Conditions.  (See, e.g., id. at 31.)  The Terms and Conditions contain the following relevant provisions:

> 4. MISTAKEN PAYMENT BY CUSTOMERS
>
> (a) If a Customer mistakenly delivers payment to you of an Account Receivable you have sold to us, you will hold such payment as trustee for us and will immediately deliver it to us by personal delivery or by overnight commercial courier.  . . .
>
> . . .
>
> 5. WARRANTIES
>
> You represent and warrant to us that the following is true and correct with respect to every offered or purchased Account Receivable:
>
> . . .
>
> (j) The Customer will pay when due, without demand, the

---

[4]     The complaint acknowledges a scrivener's error in the Corporate Guaranty that identifies the "Seller" of the accounts receivable as RG Group, rather than the intended entity, PDI. Plaintiff alleges that "[t]he parties were fully aware that this Corporate Guaranty was intended to guaranty PDI performance."  (ECF No. 1 at 3 n.2.)

[5]     One of the Purchase Agreements is ambiguous as to whether the seller is PDI or RG Group.  (ECF No. 1 at 32.)  The document heading refers to PDI, but the Seller name above the signature line is RG Group.  (Id.)  As explained below, plaintiff will need to address this discrepancy in order to obtain an appropriate award of damages from each entity.

3

Gross Amount of Account Receivable and is current in all accounts receivable owed to you.

. . .

8. DEFAULTS, REMEDIES, RECOURSE

(a) An Event of Default occurs if:

(i) there has been a breach of any warranty, representation or covenant herein; or

. . .

(iii) you fail to pay us any amounts when due; or

. . .

(vi) your Customer fails to pay us the gross amount of an invoice or Account Receivable in full when due . . . .

(b) If any event of default occurs, we may . . . require you to immediately purchase for cash any and all outstanding accounts receivable previously purchased from you . . . for a price that is the gross amount of each and every Account Receivable outstanding in whole or in part. . . .

(Id. at 18-21.)

Although plaintiff does not attach a copy of the Terms and Conditions signed by RG Group, plaintiff alleges that "RG agreed to sell accounts receivable on the same terms and conditions as PDI" (id. at 4 n.3), and, indeed, the attached Purchase Agreements for the sale of RG Group's accounts receivable state that the Seller acknowledges receipt of those same Terms and Conditions (id. at 31, 36-38).

All told, Quantum agreed to purchase from PDI and RG Group accounts receivable totaling a gross invoice amount of $404,002.64.  (Id. ¶ 17.)  Quantum paid PDI and RG Group a total "funded amount" of $323,242.51 for use as working capital.  (Id. ¶¶ 17, 30, 44.)  Quantum does not specify what portion of the funded amount was paid to PDI versus to RG Group.  (See id. ¶ 30.)

Quantum alleges that defendants "collected some or all of the accounts receivable," totaling "no less than $100,000.00," but did not remit the payments on any of the accounts to Quantum, except for partial payment of $22,458.66.  (Id. ¶ 18.)  Quantum further alleges that PDI

4

and RG Group's customers also failed to pay Quantum the amounts owed on their respective accounts receivable.  (Id. ¶ 21.)

Without citation to any of the attached contracts, Quantum further alleges that "[u]nder the [Purchase] Agreements," PDI and RG Group agreed that, in the event of a default, they would "purchase the gross amount of each and every receivable and pay certain daily fees, which is calculated at an agreed rate of 0.00196% of the outstanding gross accounts receivable."  (Id. ¶ 20.)  Quantum seeks to recover "all sums due and owing under the various agreements between the parties," including the balance of the original funded amount and these continually accruing daily fees—in addition to prejudgment interest, costs, and attorney's fees.  (Id. ¶¶ 22-23; id. at 8.)

### B.  Procedural History

Quantum filed its complaint on December 28, 2018.  (ECF No. 1.)  Based on the above allegations, Quantum asserts seven state-law causes of action:  (claim 1) breach of contract against all defendants (id. ¶¶ 29-37); (claims 2-4) money had and received, open book account, and account stated against PDI and RG Group (id. ¶¶ 38-53); (claims 5-6) intentional misrepresentation and negligent misrepresentation against Gehm III only (id. ¶¶ 54-66;); and (claim 7) conversion against all defendants (id. ¶¶ 67-71).

Quantum personally served defendants Gehm Jr., PDI, and RG Group; and when none answered the complaint, plaintiff obtained an entry of default against each of them on April 3, 2019.  (ECF Nos. 4-9.)  Shortly after service, plaintiff's counsel was contacted by an attorney for Gehm Jr. and PDI, who acknowledged receiving the requests for entry of default and declined plaintiff's counsel's offer to set aside the defaults, stating that due to his clients' "financial situation, we see no reason to set aside the default."  (ECF No. 49-3 at 58-60.)  Because of difficulty in locating Gehm III (Gehm Jr.'s son), the District Judge granted plaintiff's request to serve Gehm III by publication.  (ECF Nos. 11, 13.)  Per the court's order, publication was made in Sacramento County as well as two counties in Missouri where Gehm III was last known to have resided.  (ECF Nos. 14-15.)

On August 19, 2019, Gehm III and previously defaulted RG Group—through counsel— filed an Answer and Cross Claim (against Gehm Jr. and PDI for contribution and indemnity).

1  (ECF No. 18.)  The case proceeded for a short time, but on April 29, 2020, the District Judge

2  granted Gehm III's and RG Group's counsel leave to withdraw.  (ECF No. 29.)  The order gave

3  RG Group fourteen days to retain new counsel, since an entity cannot represent itself in court.

4  (Id.; see L.R. 183(a).)  RG Group failed to obtain counsel, and the District Judge referred the case

5  to the undersigned for further proceedings under Local Rule 302(c)(21) (governing pro se cases).

6  (ECF No. 37.)

7         Gehm III and RG Group then failed to provide Rule 26(a)(1) initial disclosures, in

8  violation of the undersigned's June 19, 2020 order compelling such production.  (ECF No. 35.)

9  Despite the undersigned's warning that failure to respond would constitute grounds for further

10  sanctions, including default (id. at 2), none of the defendants appeared at the initial scheduling

11  conference held remotely on November 12, 2020 (ECF No. 41).  At the conference, plaintiff's

12  counsel stated that there had been no contact with defendants since defense counsel withdrew,

13  and it was determined that a motion to set aside the Answer and Cross Claim was appropriate—so

14  that default proceedings could resume.  (ECF No. 41.)  On December 3, 2020, the undersigned

15  granted plaintiff's ex parte application and set aside the August 19, 2019 Answer and Cross

16  Claim by Gehm III and RG Group.  (ECF Nos. 18, 43, 44.)  As instructed by the undersigned, the

17  Clerk of Court entered default against Gehm III and RG Group.  (ECF No. 45.)

18         On January 14, 2021, plaintiff sought entry of default judgment by the Clerk under

19  Rule 55(b)(1), but the undersigned rejected that attempt and ordered plaintiff to file a fully

20  noticed application under Rule 55(b)(2) if it wished to obtain default judgment.  (ECF Nos. 46,

21  47.)  On April 5, 2021, plaintiff filed the instant motion for default judgment, together with

22  supporting materials.  (ECF Nos. 49, 49-1 to 49-4.)  With no opposition received by any

23  defendant, the court took the motion under submission.  (ECF No. 50.)

24         Based on calculations that will be examined below, plaintiff requests in its motion that all

25  defendants be held jointly and severally liable for (A) judgment of $1,492,154.92, comprising the

26  unpaid portion of the original funded amount, plus daily factoring fees accrued up to the filing of

27  the motion for default judgment; (B) $197,600.58 in prejudgment interest as of the filing of the

28  motion for default judgment, and continuing to accrue until entry of judgment; (C) $2,816.10 in

6

costs; and (D) reasonable attorney's fees in an amount to be determined on subsequent motion.

(ECF Nos. 49-1 at 29, 49-4 (proposed order).)

### LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 55, default may be entered against a party

against whom a judgment for affirmative relief is sought who fails to plead or otherwise defend

against the action.  See Fed. R. Civ. P. 55(a).  However, "[a] defendant's default does not

automatically entitle the plaintiff to a court-ordered judgment."  PepsiCo, Inc. v. Cal. Sec. Cans,

238 F. Supp. 2d 1172, 1174 (C.D. Cal. 2002) (citing Draper v. Coombs, 792 F.2d 915, 924-25

(9th Cir. 1986)).  Instead, the decision to grant or deny an application for default judgment lies

within the district court's sound discretion.  Aldabe v. Aldabe, 616 F.2d 1089, 1092 (9th Cir.

1980).  In making this determination, the court considers the following factors:

> 1.  the possibility of prejudice to the plaintiff,
> 2.  the merits of plaintiff's substantive claim and the sufficiency of the complaint;
> 3.  the sum of money at stake in the action;
> 4.  the possibility of a dispute concerning material facts;
> 5.  whether the default was due to excusable neglect, and
> 6.  the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

Eitel v. McCool, 782 F.2d 1470, 1471-72 (9th Cir. 1986).  Default judgments are ordinarily

disfavored.  Id. at 1472.

As a general rule, once default is entered, well-pleaded factual allegations in the operative

complaint are taken as true, except for those allegations relating to damages.  TeleVideo Sys., Inc.

v. Heidenthal, 826 F.2d 915, 917-18 (9th Cir. 1987) (per curiam) (citing Geddes v. United Fin.

Group, 559 F.2d 557, 560 (9th Cir. 1977) (per curiam)); accord Fair Housing of Marin v. Combs,

285 F.3d 899, 906 (9th Cir. 2002).  In addition, although well-pleaded allegations in the

complaint are admitted by a defendant's failure to respond, "necessary facts not contained in the

pleadings, and claims which are legally insufficient, are not established by default."  Cripps v.

Life Ins. Co. of N. Am., 980 F.2d 1261, 1267 (9th Cir. 1992) (citing Danning v. Lavine, 572 F.2d

1386, 1388 (9th Cir. 1978)); accord DIRECTV, Inc. v. Hoa Huynh, 503 F.3d 847, 854 (9th Cir.

2007) (stating that a defendant does not admit facts that are not well-pled or conclusions of law);

Abney v. Alameida, 334 F. Supp. 2d 1221, 1235 (S.D. Cal. 2004) ("[A] default judgment may not

7

be entered on a legally insufficient claim.").  A party's default conclusively establishes that party's liability, but it does not establish the amount of damages.  Geddes, 559 F.2d at 560.

## II.    DISCUSSION

### A. Appropriateness of the Entry of Default Judgment Under the Eitel Factors

The undersigned finds that the weight of the Eitel factors entitles Quantum to a default judgment as to liability on five of the seven causes of action asserted—that is, all but the misrepresentation claims.

1. Quantum is prejudiced by defendants' non-responsiveness and failure to defend this suit.

The first Eitel factor considers whether Quantum would suffer prejudice if default judgment is not entered, as prejudice to a plaintiff weighs in favor of a default judgment. See PepsiCo, 238 F. Supp. 2d at 1177.  Here, Quantum served three defendants personally at the address of their registered agent in March 2019 and on defendant by publication.  (ECF Nos. 4-9, 11, 13, 14-15.)  Despite acknowledging the suit when contacted by plaintiff's counsel, defendants Gehm Jr. and PDI opted not to respond to the suit or participate in this litigation; and although defendants Gehm III and RG Group eventually answered the complaint and briefly participated in the litigation, their Answer was subsequently stricken and both ceased participating.  (ECF Nos. 18, 28, 29, 35, 45.)  Moreover, "PDI was administratively dissolved by the Missouri Secretary of State on or about September 5, 2018."  (ECF No. 1 ¶ 27; ECF No. 49-2 at 43.)  For these reasons, Quantum would be left without any other recourse against the named defendants without an entry of default judgment.  Accordingly, the first of the Eitel factors favors the entry of default judgment as to liability.

2. All claims are meritorious and sufficiently pleaded, except the misrepresentation claims.

The second and third factors (the merits of the substantive claims and the sufficiency of the complaint) are considered in tandem, due to the relatedness of the two inquiries.  The court must consider whether the allegations in the complaint are sufficient to state a claim that supports the relief sought.  See Danning v. Lavine, 572 F.2d 1386, 1388 (9th Cir. 1978); PepsiCo, 238 F. Supp. 2d at 1175.

1    To reiterate, Quantum seeks recovery from various sets of defendants under seven

2    California state-law causes of action:  breach of contract, money had and received, open book

3    account, account stated, intentional misrepresentation, negligent misrepresentation, and

4    conversion.  (ECF No. 1 at 6-14.)  The court discusses each in turn.

5        *a.  Breach of Contract*

6        As the First Cause of Action, Quantum brings a breach of contract claim against all

7    defendants.  (Id. at 6-8.)  To sufficiently state a claim for breach of contract under California

8    law,[6] plaintiff must prove "(1) the contract, (2) the plaintiff's performance of the contract or

9    excuse for nonperformance, (3) the defendant's breach, and (4) the resulting damage to the

10   plaintiff."  Richman v. Hartley, 224 Cal. App. 4th 1182, 1186 (2014).

11       As explained below, Quantum sufficiently pleads all elements of this claim with respect to

12   both PDI and RG Group.  The claim is adequately asserted against all four as to PDI's breach of

13   contract; however, given certain gaps in the allegations, the claim is stated only against RG Group

14   for its own breaching conduct.  The respective liabilities for each entity's breach are discussed in

15   detail below.

16           i.  PDI's Breach of Contract

17       First, Quantum sufficiently pleads the existence of a contract—in fact, a series of

18   contracts—between itself and PDI.  Quantum provides PDI's signed Terms and Conditions,

19   which established the governing terms for Quantum's future purchase of any accounts receivable

20   from PDI.  (See ECF No. 1 ¶ 12 (referencing Exhibit A, the Terms and Conditions).)  PDI—

21   through one of its owners, Gehm III—also signed several Purchase Agreements selling certain

22   accounts receivable to Quantum.  (Id. at 32-35.)  In signing this series of Purchase Agreements,

23   PDI sold to Quantum "all of [PDI's] rights, title, and interest in and to the accounts receivable"

24   therein listed.  (Id.)

25   ////

26

27   ─────────────

[6]     Section 15 of the Terms and Conditions states that the agreement "shall be governed by

28   and construed in accordance with the substantive laws of the state of [Quantum's] principal place
     of business," which is California.  (ECF No. 1 at 2, 22 ("Applicable Law and Venue").)

Second, Quantum adequately pleads that it fully performed under the contracts by providing PDI the funded amounts for each signed Purchase Agreement.  (Id. ¶¶ 17, 31-32.)  Moreover, the funded amount per account receivable is outlined in the individual Purchase Agreements, which PDI signed and acknowledged.  (Id. at 32-35.)

Third, Quantum pleads that PDI in multiple ways breached the contracts for those accounts receivable that PDI sold.  PDI, in violation of Section 4(a) of the Terms and Conditions, did not pay Quantum all payments delivered to PDI for the sold accounts receivable.  (See id. at 18 ("Mistaken Payment by Customers").)  Although PDI paid Quantum some or all of the $22,458.66 partial payment, Quantum alleges that PDI "failed and refused, and continue[s] to fail and refuse, to remit" the remaining amounts collected on the PDI accounts receivable.  (Id. ¶ 18.)  Further, PDI's customers did not "pay when due, without demand, the Gross Amount of Account[s] Receivable," as required by Section 5(j).  (Id. ¶ 21; id. at 19 ("Warranties").)  And despite these breaches, which constituted an "event of default" (id. at 20-21 (Sec. 8(a)(iii) & (vi)), PDI failed to buy back "any and all outstanding accounts receivable previously purchased" (id. at 21 (Sec. 8(b)).  These allegations sufficiently plead multiple breaches by PDI.

Fourth and finally, Quantum claims it was damaged by the lost value of the funds that it paid PDI, for which it was expecting a return in the form of payments from customers and daily fees.  (Id. ¶ 37.)  Therefore, the complaint adequately states a breach of contract claim against PDI for its own breaches.

ii.   Other Defendants' Liability for PDI's Breach

In addition, the complaint adequately asserts a breach of contract claim against the other three defendants based on PDI's breaches.  The claim extends against RG Group because of RG Group's signed Corporate Guaranty, which guaranteed PDI's performance of the PDI agreements.  Under the Corporate Guaranty, RG Group agreed that "[i]f Seller [PDI] fails to fully and promptly perform its obligations . . . or fails to pay us in full any money Seller owes us . . . , then it will be your obligation, in Seller's place, to perform the obligations or pay us in full without delay."  (ECF No. 1 at 28 (Sec. II.A).)  RG Group's failure to pay the amounts owed by PDI after PDI's breach was therefore in violation of the Corporate Guaranty, and the complaint

10

1   adequately states a breach of contract claim against RG Group for PDI's breaches.  For the same

2   reasons, the complaint also states a breach of contract by Gehm III arising from PDI's breach

3   given his signed Personal Guaranty, which contains language identical to the Corporate Guaranty.

4   (Id. at 25 (Sec. II.A).)

5            Finally, although he did not personally guarantee PDI's performance, a breach of contract

6   claim based on PDI's breach lies against Gehm Jr. as well, because he is alleged to be an owner

7   of the now-dissolved company.  Quantum alleges that "PDI was administratively dissolved by the

8   Missouri Secretary of State on or about September 5, 2018," and attaches to its default judgment

9   motion a notice of administrative dissolution addressed to PDI Group, to the attention of Gehm Jr.

10  (Id. ¶ 27; see ECF No. 49-2 at 43.)  Under California law, shareholders of a dissolved corporation

11  can be personally liable, to some extent, for causes of action against the dissolved corporation

12  (whether arising before or after the corporation's dissolution).  Cal. Corp. Code § 2011(a)(1)(B)

13  (permitting enforcement against shareholders who have received assets of the dissolved

14  corporation, "to the extent of their pro rata share of the claim or to the extent of the corporate

15  assets distributed to them upon dissolution of the corporation, whichever is less"); see id.

16  § 2011(a)(2) (requiring that action be brought before the earlier of the expiration of the applicable

17  statute of limitations, or 4 years after the effective date of the corporation's dissolution); Favila v.

18  Katten Muchin Rosenman LLP, 188 Cal. App. 4th 189, 213, 215 (2010), as modified on denial of

19  reh'g (Sept. 22, 2010).  Because Gehm Jr. is alleged to be a shareholder (an owner) of PDI, and

20  there is no indication that this breach of contract cause of action (filed within four *months* of

21  PDI's dissolution) was untimely, the claim can proceed against Gehm Jr., who is liable for PDI's

22  breach to the extent permitted under Section 2011.

23           Therefore, the complaint adequately pleads a breach of contract claim against all

24  defendants based on PDI's breaching conduct.

25                          iii.  RG Group's Breach of Contract

26           Quantum also sufficiently pleads a breach of contract claim against RG Group for its own

27  breaching conduct.  First, Quantum pleads the existence of contractual agreements between itself

28  and RG Group—even if just barely.  (See ECF No. 1 ¶¶ 14, 17 (referencing RG Group's signed

11

Corporate Guaranty and signed Purchase Agreements).)  The complaint alleges that RG Group "agreed to sell accounts receivable on the same terms and conditions as PDI and acknowledged as much in the [Purchase] Agreements."  (Id. at 4 n.3.)  This footnote, conclusory as it may be, is sufficient in the default judgment context to adequately plead the terms of the underlying contract incorporated in RG Group's Purchase Agreements—especially given that those Purchase Agreements expressly state that the Seller acknowledged receipt of those same Terms and Conditions (id. at 31, 36-38 ("This Agreement incorporates by reference all Terms and Conditions for Purchasing Accounts Receivable . . . , receipt of which the Seller has acknowledged.")).  Finally, RG Group's signed Purchase Agreements, themselves, sold to Quantum "all of [RG Group]'s rights, title, and interest in and to the accounts receivable" therein listed.  (Id. at 31, 36-38.)

Second, as with PDI, Quantum pleads that it fully performed under the contracts by providing RG Group the funded amounts for each signed Purchase Agreement.  (Id. ¶¶ 17, 31-32; see id. at 31, 36-38.)  Third, Quantum adequately pleads that RG Group materially breached its agreements in the same ways and for the same reasons discussed above for PDI.  (Id. ¶¶ 18, 21-22.)  Finally, Quantum claims damage by the lost value of the funds that it paid RG Group, expecting a return in the form of payments from customers.  (Id. ¶ 37.)  Therefore, the complaint adequately states a breach of contract claim against RG Group for its own breaching conduct.

iv.  <u>Other Defendants' Liability for RG Group's Breach</u>

Unlike with PDI's breach, however, the complaint does not contain sufficient allegations to state a breach of contract claim against the other three defendants for RG Group's breaching conduct.  First, plaintiff gives no reason to make PDI—a totally separate entity—responsible for RG Group's breach of its own contracts.  Whereas RG Group explicitly guaranteed PDI's performance in the Corporate Guaranty, there is no allegation that PDI did the same as to RG Group's performance.  The same problem exists for Gehm III and Gehm Jr., neither of whom are alleged to have personally guaranteed RG Group's performance.  Again, this stands in contrast to Gehm III's signing of a Personal Guaranty for PDI's agreements.  With no allegation that RG Group has been dissolved, or other allegations or arguments for holding the LLC's apparent

12

members personally liable, the complaint does not adequately plead a breach of contract claim against Gehm III or Gehm Jr. for RG Group's breach.  Thus, the breach of contract claim based on RG Group's breaching conduct is sufficiently stated only as to RG Group itself.

In sum, the complaint sufficiently states a claim of breach of contract arising from PDI's breaching conduct against PDI, RG Group, Gehm Jr., and Gehm III; and the complaint sufficiently states a claim of breach of contract arising from RG Group's breaching conduct against RG Group alone.

### b.   _Money Had and Received_

As the Second Cause of Action, Quantum brings a claim for money had and received against PDI and RG Group.  (ECF No. 1 at 8-9.)  California law provides that, to be liable for a common count of money had and received, a "plaintiff must prove that the defendant received money intended to be used for the benefit of the plaintiff, that the money was not used for the plaintiff's benefit, and that the defendant has not given the money to the plaintiff."  Avidor v. Sutter's Place, Inc., 212 Cal. App. 4th 1439, 1454 (Ct. App. 2013) (cleaned up) (citing Judicial Council of California Civil Jury Instructions No. 370).

The complaint sufficiently states a claim against both entities.  Both PDI and RG Group received some portion of the total funded amount from Quantum on their individual Purchase Agreements.  (ECF No. 1 ¶ 17; see id. at 31-38.)  These funds were intended to benefit defendants in the short term, but eventually were to be reimbursed to Quantum via collection of customer payments plus additional daily fees.  Defendants indeed received the funds up front, but Quantum was deprived of the benefit of collecting on the accounts receivable that it purchased.  PDI and RG Group "fail and refuse" to remit either the funded amount total or any customer payments to Quantum as agreed.  (Id. ¶¶ 18, 21-22.)

Quantum's claim for money had and received is sufficiently pleaded for the purpose of establishing PDI and RG Group's liability for their respective accounts receivable.  Although

////

////

////

13

1    Quantum does not plead the precise amount of funds that PDI or RG Group received from their

2    customers for the accounts receivable, that is a damages question—not a liability issue.[7]

3         c.   _Open Book Account_

4         As the Third Cause of Action, Quantum also brings a claim for an open book account

5    against PDI and RG Group.  California defines a "book account" as

6         a detailed statement which constitutes the principal record of one or more
         transactions between a debtor and a creditor arising out of a contract or some
7         fiduciary relation, and shows the debits and credits in connection therewith, and
         against whom and in favor of whom entries are made, is entered in the regular
8         course of business as conducted by such creditor or fiduciary, and is kept in a
         reasonably permanent form and manner.
9

10   Cal. Civ. Proc. Code § 337a (2021).

11        An open book account "is created by the agreement or conduct of the parties in a

12   commercial transaction."  H. Russell Taylor's Fire Prevention Service, Inc. v. Coca Cola Bottling

13   Corp., 99 Cal. App. 3d 711, 728 (1979).  Such an account "is defined as a detailed statement . . .

14   in the nature of debit and credit, arising out of contract or some fiduciary relation," showing

15   "against whom the charges are made" and "in whose favor the charges run."  Interstate Grp.

16   Administrators, Inc. v. Cravens, Dargan & Co., 174 Cal. App. 3d 700, 708 (Ct. App. 1985)

17   (cleaned up, footnote omitted).

18        Here, Quantum claims that it "kept an account of the credits and debits due and owing to

19   it from PDI and RG." (ECF No. 1 ¶ 45.)  Although Quantum fails to provide or describe an actual

20   "detailed statement" showing the charges and credits running on PDI and RG Group's accounts,

21   this allegation is—just barely—sufficient to infer that Quantum was tracking charges and credits

22   "in a reasonably permanent form and manner" so as to credit PDI and RG Group for paying or

23   forwarding customer payments as required under their respective sets of original agreements.  See

24   Cal. Civ. Proc. Code § 337a.  For the purposes of assessing liability on a default judgment, this

25   allegation sufficiently makes out a claim for an open book account against both PDI and RG

26   ───────────────────

27   [7]      And because plaintiff does not seek damages for the money had claim over and above the
     damages sought for breach of contract, this question need not be answered even for purposes of
     awarding damages.  (See ECF No. 49-4 (proposed order) at 4 (requesting total amount of
28   damages identical to the amount sought for First Cause of Action).)

                                        14

1   Group.  Heidenthal, 826 F.2d at 917-18.

2          d.  *Account Stated*

3          As the Fourth Cause of Action, Quantum also brings a claim for an account stated against

4   PDI and RG Group.  The elements of an account stated are:  "(1) previous transactions between

5   the parties establishing the relationship of debtor and creditor; (2) an agreement between the

6   parties . . . on the amount due from the debtor to the creditor; (3) a promise by the debtor . . . to

7   pay the amount due."  Zinn v. Fred R. Bright Co., 271 Cal. App. 2d 597, 600 (1969).  An "action

8   upon an account stated is not upon the original dealings and transactions of the parties," rather it

9   is "upon the new contract by and under which the parties have adjusted their differences and

10  reached an agreement."  Gardner v. Watson, 170 Cal. 570, 574 (1915); see Gleason v.

11  Klamer, 103 Cal. App. 3d 782, 786-87 (1980).

12          Quantum sufficiently pleads an account stated against both PDI and RG Group.  The

13  Purchase Agreements establish Quantum as the buyer and PDI or RG Group as the sellers of the

14  subject accounts receivable.  (ECF No. 1 at 31-38.)  Meanwhile, the Terms and Conditions

15  incorporated therein provided that PDI and RG Group would receive the short term benefit of the

16  funds fronted by Quantum while, in the longer term, owing the balance of the accounts if the

17  customers themselves failed to pay, or alternately, mistakenly paid PDI or RG Group instead of

18  Quantum.  (Id. at 18-21.)  These allegations satisfy the first and third elements of the claim, in

19  that—through their contractual promises—PDI and RG Group became indebted to Quantum for

20  any amount of the purchased accounts receivable that was not ultimately received by Quantum.

21          As to the second element, Quantum does not directly identify "an agreement between the

22  parties . . . on the amount due from the debtor to the creditor," following the original purchase of

23  the accounts.  See Zinn, 271 Cal. App. 2d at 600.  Instead, Quantum alleges that on May 4,

24  2018—about six months before filing this suit—it sent PDI and RG Group "a demand letter

25  demanding payment of the outstanding balance owed [on each of the purchased accounts

26  receivable], plus additionally accrued daily fees"; and that "[n]either PDI nor RG disputed the

27  amounts demanded in the letter."  (ECF No. 1 ¶ 50.)  Under California law, "[i]f a statement is

28  rendered to the debtor, and the debtor does not reply in a reasonable time, the law implies an

15

agreement that the amount is correct."  Martini E Ricci Iamino S.P.A.--Consortile Societa

Agricola v. W. Fresh Mktg. Servs., Inc., 54 F. Supp. 3d 1094, 1107 (E.D. Cal. 2014) (citing, *inter*

*alia*, Zinn, 271 Cal. App. 2d at 600).  Thus, the allegation that PDI and RG Group failed to

dispute the re-calculated amount owed satisfies the second element.  With all elements of the

claim present, Quantum adequately pleads an account stated claim against both PDI and RG

Group.

> e.  *Intentional and Negligent Misrepresentation*

As the Fifth and Sixth Causes of Action, Quantum brings claims for both negligent and

intentional misrepresentation against Gehm III.  (ECF No. 1 at 11-13.)  To plead a cause of action

for negligent misrepresentation—the majority of the elements of which overlap with the sister

claim of intentional misrepresentation—"a plaintiff must allege that 1) a defendant made

a misrepresentation of material fact, 2) without any grounds for believing it to be true, 3) with

the intent that plaintiff rely on it, and that 4) the plaintiff did rely on the misrepresentation,

unaware of its falsity, and 5) sustained damages as a result."  Friedman v. Merck & Co., 107

Cal. App. 4th 454, 476 (2003).  When pleading claims sounding in fraud in federal court, a

plaintiff must plead "with particularity the circumstances constituting fraud."  Kearns v. Ford

Motor Co., 567 F.3d 1120, 1125 (9th Cir. 2009) (citing Fed. R. Civ. P. 9(b)).  "California courts

have expressly held that 'causes of action for intentional and negligent misrepresentation sound in

fraud,'" and thus federal courts in this district generally hold such claims to the heightened

Rule 9(b) standard.  Zetz v. Bos. Sci. Corp., 398 F. Supp. 3d 700, 713 n.3 (E.D. Cal. 2019) (citing

Daniels v. Select Portfolio Servicing, Inc., 246 Cal. App. 4th 1150, 1166 (2016)).

There are at least two problems with Quantum's claims for misrepresentation against

Gehm III.  First, Quantum fails to plead with particularity the nature and circumstances of

Gehm III's misrepresentation.  Quantum claims that "[i]n and around the time of the execution of

the Terms and Conditions," Gehm III falsely "represented . . .both verbally and via the various

warranties contained in the Terms and Conditions, that he was the sole owner, officer and director

of PDI and had the power and authority to enter into the Terms and Conditions on behalf of PDI."

(ECF No. 1 ¶¶ 15, 55, 62.)  In reality, Quantum alleges, Gehm Jr. (Gehm III's father) was also an

16

1   owner of PDI.  (<u>Id.</u> ¶¶ 15, 56, 63.)

2          Quantum directs the court to no specific language in the Terms and Conditions containing

3   the alleged sole-owner warranty.  In independently reviewing the Warranties listed in Section 5 of

4   the Terms and Conditions, the court also was unable to locate such a warranty.  Only two

5   warranties come close.  Warranty 5(a) states in relevant part: "You have the full power to agree to

6   and perform these Terms and Conditions and to conduct your business as presently

7   conducted . . . ."  (<u>Id.</u> at 18.)  And warranty 5(m) states: "No shareholder, director, officer,

8   member or partner, or spouse or other immediate family member thereof, has a direct or indirect

9   financial interest in the Customer except as disclosed to us in writing . . . ."  (<u>Id.</u>)  Neither of these

10  warranties by Gehm III—on behalf of PDI—constitute a statement that he was the "*sole* owner,

11  officer or director of PDI" at the time of signing, as Quantum claims.  (<u>Id.</u> ¶¶ 15, 55, 62 (emphasis

12  added).)  Warranty 5(a) conveys only that Gehm III has authority to sign the agreements.  And

13  warranty 5(m), what is essentially an anti-nepotism clause, warranties only that Gehm III had no

14  family members within any of the *customer* companies.  It warranties nothing about any of

15  Gehm III's familial relatives within PDI.

16          That leaves the court with only Quantum's vague allegation that Gehm III "verbally"

17  "represented" to Quantum that he was the sole owner of PDI.  (<u>Id.</u> ¶¶ 15, 55, 62.)  But to meet the

18  particularity standard for misrepresentation, "the allegations must identify the time, place, and

19  content of the alleged misrepresentation."  <u>Miscellaneous Serv. Workers, Drivers, & Helpers,</u>

20  <u>Teamsters Local # 427 v. Philco-Ford Corp.</u>, 661 F.2d 776, 782 (9th Cir. 1981).  Even accepting

21  that the alleged misrepresentation occurred around the time of the execution of the Terms and

22  Conditions, Quantum fails to allege where the alleged misrepresentation occurred or what exactly

23  Gehm III said (or to whom).

24          Second, the complaint fails to allege at least two of the substantive elements of a

25  misrepresentation claim.  To state a cause of action for misrepresentation, Quantum must show

26  that Gehm III made a "representation as to a past or existing *material* fact."  <u>Friedman</u>, 107

27  Cal. App. 4th at 476 (emphasis added).  Even if the court accepted as true the claim that Gehm III

28  verbally warrantied that he was "sole" owner of PDI, Quantum does not explain how that

misrepresentation would materially alter the nature of the relationship between Quantum and Gehm III.  The court understands Quantum's claim that it would have also required Gehm Jr. to execute a personal guaranty for PDI's performance, had it known he was a co-owner.  (ECF No. 1 ¶¶ 15, 58, 65.).  However, obtaining a personal guaranty from Gehm Jr. only goes toward expanding the possible avenues for Quantum to collect in the event of a default by PDI.  As it turns out, since PDI was administratively dissolved in 2018, Gehm Jr. can be held personally liable for PDI's default anyway—as already explained above.  Thus, Quantum's damages and sources of recovery with or without Gehm III's alleged misrepresentation are identical, and Quantum was not damaged "as a result" of the alleged misrepresentation.  Friedman, 107 Cal. App. 4th at 476.

For these reasons, Quantum does not sufficiently plead a misrepresentation claim against Gehm III, whether intentional or negligent.

> *f.* <u>Conversion</u>

Finally, as its Seventh Cause of Action, Quantum brings a claim of conversion against all defendants.  The elements of a claim for conversion under California law are:  "(1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages."  <u>Welco Elecs., Inc. v. Mora</u>, 223 Cal. App. 4th 202, 208 (2014).

Quantum sufficiently states a conversion claim against both PDI and RG Group—and by extension from PDI's conversion, states a claim against Gehm Jr. and Gehm III as well.  First, Quantum had a right to possession of the amounts due on the accounts receivable that it bought under the Purchase Agreements—including amounts mistakenly delivered by the customer to PDI or RG Group.  (ECF No. 1 at 18 (Sec. 4(a).)  Second, Quantum sufficiently claims that, despite "collect[ing] some or all of the accounts receivable," defendants "have failed and refuse, and continue to fail and refuse, to remit the payments to [Quantum] as agreed," except for the $22,458.66 partial payment.  (<u>Id.</u> ¶ 18.)  Finally, Quantum adequately claims damages as a result of this conversion in the form of never receiving the payments customers made to PDI or RG Group on the sold accounts receivable.  Thus, a conversion claim is adequately stated against

18

1   each entity defendant for the customer payments each withheld from Quantum.[8]

2          A conversion claim is also adequately stated against Gehm Jr. and Gehm III, arising from

3   PDI's acts of conversion, due to their mutual ownership of the now-dissolved corporation.  (See

4   id. ¶ 15 (alleging that both Gehm III and Gehm Jr. were owners of PDI).)  As discussed in the

5   breach of contract analysis above, both Gehm Jr. and Gehm III are liable for PDI's conversion to

6   the extent permitted under Cal. Corp. Code § 2011.  No conversion claim lies against Gehm Jr. or

7   Gehm III for RG Group's conversion, however, because (again, as discussed in the breach of

8   contract analysis above) plaintiff alleges no connection between RG Group's conduct and the

9   individual defendants.

10         g.  _Conclusion_

11         Quantum's causes of action for breach of contract, money had and received, open book

12  account, account stated, and conversion are all meritorious and sufficiently pleaded.  Only the

13  misrepresentation causes of action are insufficiently supported by the pleadings.  Accordingly, the

14  second and third Eitel factors support entry of default judgment as to liability on all but the Fifth

15  and Sixth Causes of Action—though defendants should not necessarily be held jointly and

16  severally liable for the entirety of each cause of action, as set forth below.

17      3.  The sum of money in dispute.

18         Under the fourth factor cited in Eitel, "the court must consider the amount of money at

19  stake in relation to the seriousness of Defendant's conduct."  PepsiCo, 238 F. Supp. 2d at

20  1176-77.  Quantum here seeks default judgment damages in the amount of $1,492,154.92 plus

21  prejudgment interest, a substantial sum of money.  However, defendants had fair notice of this

22  litigation and, despite abundant opportunity to defend their interests, they actively chose not to do

23  so.  Moreover, the undersigned is not currently recommending the award of any particular sum of

24  damages because of various defects in plaintiff's explanation and proof of damages (addressed

25  _____

26  [8]  The court need not decide whether a conversion claim is also adequately pleaded against PDI or
    RG Group based on the _other_ entity's acts of conversion because plaintiff does not seek damages

27  for conversion over and above the damages sought for breach of contract—and thus the court
    need not determine exactly what amount of money received from customers but not paid to

28  Quantum each entity is responsible for in damages.

1   below).  Under these circumstances, the court finds that this factor favors the entry of a default

2   judgment as to liability on the sufficiently pleaded causes of action identified above.

3       4.   The material facts are not in dispute.

4       Because the court may assume the truth of well-pleaded facts in the complaint (except as

5   to damages) following the clerk's entry of default, there is no likelihood that any genuine issue of

6   material fact exists as to the claims that the undersigned finds adequately pleaded.  See,

7   e.g., Elektra Entm't Group Inc. v. Crawford, 226 F.R.D. 388, 393 (C.D. Cal. 2005) ("Because all

8   allegations in a well-pleaded complaint are taken as true after the court clerk enters default

9   judgment, there is no likelihood that any genuine issue of material fact exists."); accord Philip

10  Morris USA, Inc. v. Castworld Prod., Inc., 219 F.R.D. 494, 500 (C.D. Cal. 2003); PepsiCo, Inc.

11  v. California Sec. Cans, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002).  As such, the court

12  concludes that the fifth Eitel factor favors a default judgment as to liability on the sufficiently

13  pleaded causes of action identified above.

14      5.   The court sees no excusable neglect.

15      Upon review of the record before the court, there is no indication of excusable neglect

16  regarding defendants' failure to adequately defend this suit.  See PepsiCo, Inc., 238 F. Supp. 2d at

17  1177.  All defendants had ample notice of this lawsuit.  Again, defendants Gehm Jr. and PDI

18  never appeared in this action, despite acknowledging receiving notice of the suit; and defendants

19  Gehm III and RG Group eventually responded to and briefly participated in this litigation—only

20  to later disappear from the litigation and have their Answer set aside.  Given the fact that all

21  defendants intentionally abandoned defending this lawsuit, there is no indication that defendants'

22  default resulted from any excusable neglect.  This factor also favors the entry of a default

23  judgment as to liability on the sufficiently pleaded causes of action identified above.

24      6.   The policy favoring disposition on the merits is outweighed by defendants' failure to
         defend this lawsuit after multiple opportunities and years of delay.

25

26      "Cases should be decided upon their merits whenever reasonably possible."  Eitel, 782

27  F.2d at 1472.  However, this policy standing alone is not dispositive, especially where a defendant

28  fails to appear or defend itself in an action.  PepsiCo, 238 F. Supp. 2d at 1177; see also Craigslist,

1    Inc. v. Naturemarket, Inc., 694 F. Supp. 2d 1039, 1061 (N.D. Cal. 2010).

2           Here, although the undersigned would prefer that this case be resolved on the merits, that

3    policy does not, by itself, preclude the entry of default judgment.  Defendants' own decision not

4    to defend themselves here is what prevents the case from being decided on the merits.  For these

5    reasons, this factor also tips in favor of granting a default judgment as to liability on the

6    sufficiently stated causes of action identified above.

7           **B.   Terms of the Judgment to be Entered**

8           Pursuant to the above analysis, the Eitel factors weigh in favor of entering default

9    judgment as to liability on all but the Fifth and Sixth Causes of Action, in the following manner.

10   For the First Cause of Action, all four defendants should be held jointly and severally liable for

11   PDI's breach of contract, with Gehm Jr.'s liability extending only so far as permitted under Cal.

12   Corp. Code § 2011; and RG Group should be held solely liable for its own breach of contract.

13   For the Second through Fourth Causes of Action, PDI and RG Group should each be held solely

14   liable for their own respective conduct underlying the claims of money had and received, open

15   book account, and account stated.  Finally, for the Seventh Cause of Action, defendants PDI,

16   Gehm Jr., and Gehm III should be held jointly and severally liable for PDI's conversion, with

17   Gehm Jr. and Gehm III's liability extending only so far as permitted under Cal. Corp. Code

18   § 2011; and RG Group should be held solely liable for its own conversion.

19          Normally, the undersigned would proceed to analyze the appropriate amount of damages

20   to award, but in this case, there are several issues with calculating damages (and consequently,

21   prejudgment interest) that plaintiff must first address.  Therefore, the undersigned recommends

22   that Quantum's request for default judgment as to damages be denied without prejudice to its

23   renewal on a subsequent motion that addresses the deficiencies noted below.

24          For purposes of assessing the extent of damages to be awarded, the court focuses solely on

25   the breach of contract cause of action, which provides the basis for the greatest amount of

26   damages requested and includes the amounts of damages requested for the subsidiary causes of

27   action.  Plaintiff seeks four forms of relief, overall:  (1) compensatory damages, (2) prejudgment

28   interest, (3) costs, and (4) attorney's fees in an amount to be determined.  In support, plaintiff

1  provides a detailed affidavit of Barry Johnson, Quantum's sole owner and director, along with

2  supporting documents including the same contracts attached to the complaint.  (ECF No. 49-2.)

3  The court addresses each request for relief in turn.

4      1.  Compensatory Damages

5          As compensation for PDI and RG Group's breaches of contract, plaintiff seeks damages

6  consisting of (a) the original "funded amount," less the partial payment already received, and

7  (b) daily "factoring fees" that plaintiff alleges accrued from the date of each Purchase

8  Agreement's signing.  (ECF No. 49-1 at 18-20.)  Neither request is adequately supported by the

9  current record.

10         a.  The contractually funded amount

11         Plaintiff alleges that, "[i]n accordance with the [Purchase] Agreements" it "funded the

12  agreed upon amount of $323,242.51" to PDI and RG Group for purchase of the accounts

13  receivable.  (ECF No. 1 ¶¶ 17, 30, 44.)  Subtracting the $22,458.66 payment collected, plaintiff

14  seeks to recover the unpaid $300,783.85.  (ECF No. 1 ¶¶ 18, 33; ECF No. 49-1 at 20.)

15         There are two problems with this request.  First, plaintiff does not explain the evidentiary

16  basis for its claim that the original funded amount was $323,242.51.  Mr. Johnson's averment that

17  $323,242.51 was the "agreed upon amount" (ECF No. 49-2 ¶ 13) might suffice if no other proof

18  can be had; but plaintiff also argues that the funded amounts "are recorded on the invoices for the

19  purchase of the accounts receivable," i.e. the individual Purchase Agreements.  (ECF No. 49-1

20  at 22.)  Plaintiff does not give more detail than that, but on independent inspection of the eight

21  Purchase Agreements, the court sees that each Purchase Agreement lists an "Initial Payment"

22  amount, and that the sum of all eight Initial Payment amounts totals $323,202.11,[9] a figure very

23  close to the $323,242.51 plaintiff and Mr. Johnson put forth as the total funded amount.  If these

24  Initial Payments comprise the total funded amount, plaintiff must adjust its damages request

25  downward to match this slightly lower figure.  If the funded amount was in fact the alleged higher

26  figure ($323,242.51), plaintiff should provide evidentiary support for that number, or otherwise

27  _____

28  [9]      $19,666.11 + $51,824 + $52,400 + $55,600 + $23,400 + $52,332 + $26,020 + $41,960 = $323,202.11.  (ECF No. 1 at 31-38; ECF No. 49-2 at 25-32.)

1     explain how it arrived at that number.

2           Second, because the other three defendants are not liable for RG Group's breach of

3     contract, as explained above, plaintiff must separate the portion of the funded amount that was

4     paid to RG Group from the portion paid to PDI.  Presumably, the amount paid to each entity is

5     reflected on the Purchase Agreements which each specify the seller as either PDI or RG Group

6     (with the exception of the one Purchase Agreement that ambiguously refers to both PDI and RG

7     Group, see ECF No. 1 at 32).  However, the court will await further explanation from plaintiff as

8     to which (if any) of the dollar amounts listed on the Purchase Agreements reflects the working

9     capital "funded amount" paid to each entity in return for the accounts receivable sold by each.

10          In any renewed motion for default judgment as to damages, plaintiff should take care to

11    subtract from the proper entity the appropriate portion of the $22,458.66 payment collected.

12    Based on Mr. Johnson's affidavit, it appears this payment (consisting of two separate payments to

13    Quantum in 2017) should be attributed to one or more accounts receivable sold by PDI.  (ECF

14    No. 49-2 ¶ 14.)  If that is accurate, the amount of damages requested for PDI's (and only PDI's)

15    breach of contract should be reduced accordingly.

16          b.  Daily factoring fees

17          Most of plaintiff's requested compensatory damages, some $1,191,371.07, derive from

18    daily "factoring fees" associated with the purchased accounts receivable.  (ECF Nos. 49-1 at 20,

19    49-2 ¶ 18.)  Parroting a key allegation from the complaint, Mr. Johnson avers that "[u]nder the

20    [Purchase] Agreements, if any default occurs, PDI and/or RG GROUP, as the case may be, shall

21    purchase the gross amount of each and every receivable and pay certain daily fees, which is

22    calculated at an agreed rate of 0.00196% of the outstanding gross accounts receivable."  (ECF

23    No. 49-2 ¶ 16; see ECF No. 1 ¶ 20.)  Mr. Johnson explains that this fee is known as a "factoring

24    fee" in the industry and that the "parties agreed that this daily fee was reasonable given Plaintiff's

25    delivery of working capital" in exchange for the accounts receivable.  (ECF No. 49-2 ¶ 16.)

26    Plaintiff seeks a damages award that includes these daily factoring fees commencing from the

27    signing of each of the Purchase Agreements, which were executed on different days ranging from

28    October 27, 2016 to February 15, 2017.  To arrive at the requested $1,191,371.07 in fees,

1    Mr. Johnson first charts the fees accruing at 0.00196% on the gross invoice amount for each

2    account receivable—from the execution of each individual Purchase Agreement up to the filing of

3    the complaint—totaling $576,654.81.[10]  (ECF No. 49-2 at 5-6.)  He then calculates that fees have

4    since continued to accrue for all outstanding accounts receivable at a flat rate of $747.83 per

5    day.[11]  (Id. ¶ 18.)  Mr. Johnson explains that this flat rate is calculated by taking the outstanding

6    gross accounts receivable amount as of the complaint's filing, $381,543.98 (the $404,002.64

7    original gross accounts receivable total, minus the since-collected $22,458.66), and multiplying it

8    by 0.00196.  (Id.)  For the 822 days passing between the date of the filing of the complaint and

9    the filing of his affidavit, Mr. Johnson then adds $614,716.26 (822 x $747.83).  (Id.)

10            There are several issues with plaintiff's requested factoring fee damages.  The problems

11   primarily stem from the total absence of any reference to such fees in any of the contracts

12   attached to the complaint.  Plaintiff never cites, and the court was unable to independently locate,

13   a reference to the daily accrual of any fees in any of the contracts at issue.  All the court has to go

14   on is Mr. Johnson's conclusory averment that "the parties agreed" that "if any default occurs," the

15   sellers would "pay certain daily fees," "calculated at an agreed rate of 0.00196% of the

16   outstanding gross accounts receivable."  (Id. ¶ 16.)  The Terms and Conditions only state that,

17   upon default, Quantum may "require you [the Seller] to immediately purchase for cash any and

18   all outstanding accounts receivable previously purchased from you," without mention of any daily

19   accruing fees.  (Id. at 15 (Sec. 8(b).)

20            In the absence of any express written agreement in the contracts for defendants to pay the

21   alleged factoring fees, the court requires a more fulsome averment of (1) when and how PDI or

22   RG Group agreed to the factoring fees now sought, and (2) the precise terms of the factoring fee

23   agreement.  See Heidenthal, 826 F.2d at 917-18 ("The general rule of law is that upon default the

24   
     _____

25   [10]      Due to an acknowledged mathematical error, plaintiff requested slightly higher factoring
     fees in the complaint.  (ECF No. 49-1 at 8 n.3.)  Plaintiff calculated $593,138.71 owed in
26   factoring fees from the signing of the Purchase Agreements through the filing of the complaint.
     (ECF No. 1 ¶ 20.)

27   [11]      Again, plaintiff acknowledges that the complaint incorrectly requested a slightly higher
28   continuing rate of accrual at $748.48.  (ECF No. 1 ¶ 20.)

                                         24

factual allegations of the complaint, except those relating to the amount of damages, will be taken as true.").  The court requires more proof—whether by a more detailed affidavit, or other documentary evidence—that plaintiff and PDI and plaintiff and RG Group (through their designated officers) agreed to the factoring fee rate of 0.00196% upon executing the Purchase Agreements.

In addition, the court requires proof of how the parties agreed the factoring fee would operate, regardless of the rate itself.  According to the complaint and Mr. Johnson, the daily factoring fees are triggered "if any default occurs."  (ECF No. 1 ¶ 20 ("Under the [Purchase] Agreements, *if any default occurs*, PDI and/or RG . . . shall purchase the gross amount of each and every receivable and pay certain daily fees.") (emphasis added); ECF No. 49-2 ¶ 16 (same).) Yet, plaintiff calculates the requested factoring fee damages from the date of the *signing* of each Purchase Agreement.  If that is how the parties intended the factoring fees to operate—accruing as of the execution of each respective Purchase Agreement—plaintiff must provide some proof of that fact.  If, instead, the parties intended the factoring fees to accrue as of the seller's *default*, then plaintiff must prove to the court on what date each seller (PDI and RG Group) first defaulted and calculate the factoring fee damages accordingly.[12]

On the current motion for default judgment, the court lacks a sufficient factual basis to impose the substantial compensatory damages requested.  Plaintiff is invited to provide the requested further proof—or to otherwise respond to the undersigned's findings—in objections to these findings and recommendations, due within 21 days, or in a separate renewed motion for default judgment as to damages.

2.  Prejudgment Interest

Plaintiff also seeks prejudgment interest on the above compensatory damages at a rate of 10% per annum from the date of the filing of the complaint (12/28/2018) to the filing of Mr. Johnson's affidavit (03/30/2021), totaling $197,600.58, and continuing at a rate of $240.39 per

---

[12]  As discussed above with respect to compensatory damages for the funded amount, plaintiff should also separately identify the portion of the factoring fees owed by RG Group for its own accounts receivable, as the other defendants are not jointly and severally liable for those fees.

1    day to the date of entry of judgment.  (ECF Nos. 49-1 at 20, 49-2 at 8.)

2          Prejudgment interest "serves to compensate [the prevailing wronged party] for the loss of

3    use of money due as damages from the time the claim accrues until judgment is entered, thereby

4    achieving full compensation for the injury those damages are intended to redress."  Schneider v.

5    County of San Diego, 285 F.3d 784, 789 (9th Cir. 2002) (internal quotation omitted).

6    Prejudgment interest is a substantive part of a plaintiff's claim, and state law generally governs

7    the award of prejudgment interest in diversity actions.  Oak Harbor Freight Lines, Inc. v. Sears

8    Roebuck & Co., 513 F.3d 949, 961 (9th Cir. 2008).  "When a contract includes a valid choice of

9    law provision, the court applies the law of the chosen state to find the appropriate prejudgment

10   interest."  Phillips 66 Co. v. Petros Rai Stations, LLC, 2016 U.S. Dist. LEXIS 56325, at *21-23

11   (E.D. Cal. April 26, 2016); see also In re FKF 3, LLC, 2018 U.S. Dist. LEXIS 183087, at *40-41

12   (S.D.N.Y Oct. 24, 2018) ("When determining the applicable prejudgment interest rate, courts

13   look to the *source of the law underlying a party's claim* . . . 'where prejudgment interest can only

14   be awarded on the basis of what is solely a state claim, it is appropriate to use the state interest

15   rate.'" (emphasis added)).

16          Here, the Terms and Conditions, incorporated by reference in the individual Purchase

17   Agreements, provide that the agreement would be governed under "the substantive laws of the

18   state of [Quantum]'s principal place of business."  (ECF No. 49-2 at 16 (Sec. 15).)  Plaintiff's

19   principal place of business is in Sacramento, California (ECF No. 1 ¶ 1), so California law

20   governs the calculation of prejudgment interest.  Under California law, "[i]f a contract . . . does

21   not stipulate a legal rate of interest, the obligation shall bear interest at a rate of 10 percent per

22   annum after a breach."  Cal. Civ. Code § 3289(b) (2021).  The Terms and Conditions do not

23   specify any particular rate of interest, instead providing that Quantum would "comply with the

24   applicable law governing the maximum rate permissible by law."  (ECF No. 49-2 at 16

25   (Sec. 13(a)).)  Thus, the court finds that Quantum is entitled to the applicable prejudgment

26   interest rate of 10%.

27          The court withholds recommending a particular dollar amount or daily accrual rate for

28   prejudgment interest at this juncture, however, because the prejudgment interest award is

26

1  contingent on the as-yet-undetermined amount of compensatory damages—and must also be

2  awarded separately against PDI and RG Group.  Plaintiff's objections or renewed motion for

3  default judgment as to damages should specify the revised dollar amount and/or daily accrual rate

4  sought as prejudgment interest on the damages for each entity defendant.

5         3.  <u>Attorneys' Fees and Costs</u>

6         Plaintiff requests costs of $2,816.10 for filing fees, service of process fees, and fees for the

7  court-ordered service by publication.  (ECF No. 49-1 at 20.)  Plaintiff does not request a specific

8  amount of attorneys' fees but seeks an order acknowledging that plaintiff is entitled to attorney's

9  fees in an amount to be proven on subsequent motion.  (<u>Id.</u>)

10         Under California law, reasonable attorney's fees and costs are available to the prevailing

11  party in a contract action if the contract specifically provides for such an award.  Cal. Civ. Code

12  § 1717.  Section 9 of the Terms and Conditions provides that, if a collection agency or attorney

13  was engaged to enforce the agreement, the seller would "pay all [of Quantum's] expenses,

14  including corresponding fees, expenses and other costs, together with the maximum interest

15  allowed by law applied to such amounts."  (ECF No. 49-2 at 15 (Sec. 9(a)(iii)).)  Likewise, both

16  Gehm III's Personal Guaranty and RG Group's Corporate Guaranty contain an agreement "to pay

17  reasonable attorney's fees and all other costs and expenses [Quantum] incur[red] in enforcing or

18  otherwise in any way arising out of this Guaranty."  (<u>Id.</u> at 20, 23 (Sec. V).)  The proof of costs

19  attached to Mr. Johnson's affidavit are for compensable expenditures totaling the requested

20  $2,816.10.

21         Accordingly, if and when plaintiff renews its motion for default judgment as to damages,

22  the court sees no reason to deny an award of reasonable attorney's fees and costs, for which all

23  four defendants would be jointly and severally liable.[13]

24  ///

25  ///

26

27  [13]    Gehm Jr.'s liability for attorney's fees stems from his personal liability for causes of
action against his since-dissolved company, PDI, and will be limited by statute.  <u>See</u> Cal. Corp.
28  Code § 2011.

27

1   **<u>CONCLUSION</u>**

2         For the reasons stated herein, the undersigned recommends that Quantum be granted

3   default judgment as to liability on all but the Fifth and Sixth Causes of Action, in the following

4   manner.  For the First Cause of Action, all four defendants should be held jointly and severally

5   liable for PDI's breach of contract, with Gehm Jr.'s liability extending only so far as permitted

6   under Cal. Corp. Code § 2011; and RG Group should be held solely liable for its own breach of

7   contract.  For the Second through Fourth Causes of Action, PDI and RG Group should each be

8   held solely liable for their own respective conduct underlying the claims of money had and

9   received, open book account, and account stated.  Finally, for the Seventh Cause of Action,

10  defendants PDI, Gehm Jr., and Gehm III should be held jointly and severally liable for PDI's

11  conversion, with Gehm Jr. and Gehm III's liability extending only so far as permitted under Cal.

12  Corp. Code § 2011; and RG Group should be held solely liable for its own conversion.

13        Additionally, the undersigned recommends that Quantum's request for default judgment

14  as to damages be denied without prejudice at this time.  Should Quantum wish to provide

15  argument or further proof with respect to the compensatory damages and prejudgment interest

16  issues identified above, it may do so in objections to these findings and recommendations, due

17  within 21 days, or in a separate renewed motion for default judgment as to damages.

18        Accordingly, it is HEREBY RECOMMENDED that:

19      1.  Plaintiff's Motion for Default Judgment (ECF No. 49) be GRANTED in part and

20          DENIED in part;

21      2.  The motion should be granted with respect to liability as follows:

22          a.  All defendants should be held jointly and severally liable for PDI's breach of

23             contract under the First Cause of Action;

24          b.  RG Group should be held liable for RG Group's breach of contract under the First

25             Cause of Action;

26          c.  PDI and RG Group should each be held separately liable for their respective

27             portions of the money had and received claim in the Second Cause of Action;

28  *///*

   d. PDI and RG Group should each be held separately liable for their respective portions of the open book account claim in the Third Cause of Action;

   e. PDI and RG Group should each be held separately liable for their respective portions of the account stated claim in the Fourth Cause of Action;

   f. PDI, Gehm Jr., and Gehm III should be held jointly and severally liable for PDI's conversion under the Seventh Cause of Action; and

   g. RG Group should be held liable for RG Group's conversion under the Seventh Cause of Action.

3. The motion should be denied with respect to liability in that defendant Gehm III should not be held liable for either intentional or negligent misrepresentation under the Fifth and Sixth Causes of Action; and

4. The motion should be denied without prejudice with respect to damages.

  These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one (21) days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served on all parties and filed with the court within seven (7) days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156-57 (9th Cir. 1991).

Dated:  December 6, 2021

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

quan.3279

29